IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ANGELA WORKMAN,                                )
individually and as personal representative of )
the Estate of Paul Workman,                    )
                                               )
                         Plaintiff,            )
                                               )
    v.                                         )   Case No. 20-2605-JWL
                                               )
CHRISTOPHER KRETZER and                        )
MARTEN TRANSPORT, LTD.,                        )
                                               )
                         Defendants.           )
                                               )
_____)

# MEMORANDUM AND ORDER

This wrongful death action presently comes before the Court on the parties' motions to exclude certain expert testimony. By her motion (Doc. # 58), plaintiff seeks to exclude certain testimony by defendants' experts Sarah Urfer and Gray Beauchamp. As more fully set forth below, this motion is **granted in part and denied in part**. By their motions (Doc. ## 59, 63), defendants seek to exclude certain testimony by plaintiff's expert Brooke Liggett. For the reasons set forth below, defendants' motions are hereby **denied**.

## I.   Governing Standards

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court instructed that district courts are to perform a "gatekeeping" role concerning the admission of expert testimony. *See id.* at 589-93; *see also Kumho Tire Co.*

*Ltd. v. Carmichael*, 526 U.S. 137, 147-48 (1999).  The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

*See* Fed. R. Evid. 702.

In order to determine that an expert's opinions are admissible, this Court must undertake a two-part analysis:  first, the Court must determine that the witness is qualified by "knowledge, skill, experience, training, or education" to render the opinions; and second, the Court must determine whether the witness's opinions are "reliable" under the principles set forth in *Daubert* and *Kumho Tire*.  *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001). The rejection of expert testimony is the exception rather than the rule.  *See* Fed. R. Evid. 702 advisory committee notes.  Nevertheless, "[t]he proponent of expert testimony bears the burden of showing that its proffered expert's testimony is admissible."  *See United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

In *Daubert* the Supreme Court listed four factors relevant to assessing reliability: (1) whether the theory has been tested; (2) whether the theory has been subject to peer

review and publication; (3) the known or potential rate of error associated with the theory; and (4) whether the theory has attained widespread or general acceptance. *See Daubert*, 509 U.S. at 592-94. In *Kumho Tire*, however, the Supreme Court emphasized that these four factors are not a "definitive checklist or test" and that a court's inquiry into reliability must be "tied to the facts of a particular case." *See Kumho Tire*, 526 U.S. at 150. In some cases, "the relevant reliability concerns may focus upon personal knowledge or experience," rather than the *Daubert* factors and scientific foundations. *See id.* (quoted in *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1235 (10th Cir. 2004)). The district court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *See Kumho Tire*, 526 U.S. at 152.

### II. <u>Plaintiff's Motion to Exclude</u>

#### A. *<u>Testimony by Sarah Urfer</u>*

Defendants have designated Sarah Urfer, a forensic toxicologist, as a retained expert in this case. In her report Ms. Urfer discussed the results of laboratory tests of decedent's blood obtained during an autopsy performed six days after the accident. Ms. Urfer noted that the tests showed particular concentrations of three drugs: amphetamine, commonly known as Aderall, a central nervous system (CNS) stimulant; phentermine, a CNS stimulant; and alprazolam, commonly known as Xanax, a CNS depressant. Ms. Urfer discussed these drugs' therapeutic ranges and the effects of taking them (even within those therapeutic ranges), including the effects of taking them together, and including the effects on one operating a vehicle. Ms. Urfer concluded as follows:

3

> It is my professional opinion that, in general, I would expect this combination of amphetamine, phentermine, and alprazolam to cause substantial impairment. Mr. Workman's inability to avoid the collision with Mr. Kretzer's semi-trailer is consistent with the toxicology results and the impairment I would expect. Prescription medications can be impairing even when taking as prescribed by a doctor, and that impairment can become more pronounced when taken with other medications that effect [*sic*] the central nervous system. While Mr. Workman did possess a prescription for both d-amphetamine and alprazolam, alprazolam can be impairing even within the therapeutic range. The level of amphetamine detected in Mr. Workman's blood at the time of the autopsy was nearly six times greater than the maximum therapeutic range and is inconsistent with Mr. Workman having taken a single 30 mg dose as prescribed. Therefore, it is my professional opinion that a person such as Mr. Workman would be substantially incapable of properly and safely operating a motor vehicle at the time of the crash while under the influence of these drugs as described.

In seeking to exclude certain expert opinions, plaintiff does not object to Ms. Urfer's qualifications. Rather, plaintiff argues that the opinions do not satisfy the reliability requirement. Specifically, plaintiff argues that Ms. Urfer's opinions based on a quantitative analysis of decedent's blood should be excluded as unreliable because the blood was drawn from decedent's chest cavity and not from another location as recommended, with the result that the findings were likely tainted by post-mortem redistribution (PMR) of the drugs in decedent's system.

Ms. Urfer agreed in her deposition that taking blood from the femoral or iliac vessels is ideal if such blood is available. She also testified that PMR primarily becomes an issue in the case of an unrefrigerated body, but that while refrigeration slows PMR and decreases the likelihood of issues, it does not prevent PMR altogether. Ms. Urfer did not dispute that PMR is always a possibility, and she testified that she was unable to assess whether and to what extent PMR occurred with respect to decedent because she had no means (such as a

4

second blood draw from another location) by which to make such assessment, although she saw no indication of elevated results from PMR in this case. When asked for an authoritative source stating that a quantitative analysis could be reliably performed on a blood draw taken from the chest cavity, Ms. Urfer answered that she could not provide such a source at that time, but that she would need to research the issue, although she further stated that "[q]uantification from chest cavity blood is not uncommon."

Plaintiff relies on this inability of Ms. Urfer or defendants to provide any authority confirming the reliability of quantitative analyses based on chest cavity blood. In responding to plaintiff's motion, defendants have attached a new affidavit by Ms. Urfer.[1] In the affidavit, Ms. Urfer states that the drugs found in decedent's blood would have caused impairment in any effective level, and thus that his driving ability was likely impaired even considering only a qualitative analysis of decedent's blood. She does not, however, provide any authority for the reliability of a quantitative analysis in this case, despite having had the opportunity to research that issue as suggested in her deposition.

Defendants also cite deposition testimony by William Schroeder, whom they identify as the Certifying Scientist from the lab that performed the blood tests. The proffered deposition excerpt (which does not include any evidence of Mr. Schroeder's qualifications) does not provide the necessary authority on this issue, however. When

---

[1] Plaintiff appears to take issue with defendants' use of an affidavit, as she argues that defendants have attempted to "sandbag" her in this way. Submission of the affidavit was not improper, however; indeed, the Court would ordinarily expect the parties to submit evidence, including from experts, directed to specific issues relevant to a *Daubert* motion. Plaintiff has not identified any way in which the affidavit is inconsistent with Ms. Urfer's deposition testimony or is otherwise improper.

asked whether he considered chest cavity blood to be a reliable source to test, he answered that "[i]t can be;" he stated that he was not aware of anything "that would say that it's not a suitable source for forensic testing;" and he testified that "we certainly see chest cavity blood routinely in our day-to-day work." These statements were not specific to quantitative testing (at least in the excerpts provided), however, and he did not identify the circumstances in which using such blood "can be" reliable or otherwise indicate that such use would be reliable in this case. Like Ms. Urfer, he did not identify a source indicating the reliability of using chest cavity blood for quantitative analysis.

The Court does agree with defendants that plaintiff's own sources are not particularly helpful. Plaintiff cites a position paper by the National Association of Medical Examiners (NAME), but that paper (which is not directly relevant because it addresses the identification of drug overdoses) merely states that the use of femoral blood is best because of PMR, that delay can be a factor in causing inaccuracies, and that post-mortem drug concentrations cannot be used to calculate reliably the quantity consumed (there was no such use here by Ms. Urfer). Plaintiff also cites the testing lab's procedures, but that document merely recommends that femoral blood be used. Neither source states that a quantitative analysis of chest cavity blood is unreliable. Nor has plaintiff included any evidence in which an additional expert has interpreted these sources or has offered an opinion on the issue. Thus, defendants are correct that plaintiff has failed to identify expert authority indicating that the use of chest cavity blood for quantitative analysis is not reliable.

6

That failure by plaintiff is not fatal, however, as defendants bear the burden of establishing that their proffered expert's opinions are based on a reliable methodology. Defendants have not met that burden, as they have offered no authority establishing the reliability of the use of a quantitative analysis performed on blood from a chest cavity – despite the opportunity to locate such authority after Ms. Urfer's deposition. Even defendants' own cited experts, Ms. Urfer and Mr. Schroeder, have not stated that such use is reliable; they have only generally stated that such use is routine or common, although they have not stated that such use is widespread within this area of expertise. Thus, defendants have not established that any of the factors cited in *Daubert* for the reliability of scientific methodology weigh in favor of admission here. The Court concludes in its discretion that defendants have not established the requisite reliability. Accordingly, the Court will exclude any testimony by Ms. Urfer based on a quantitative analysis of decedent's blood.

The Court notes that this ruling does not prevent Ms. Urfer from offering an opinion based on a *qualitative* analysis of decedent's blood. Ms. Urfer may therefore testify that certain drugs were found in decedent's blood, and she may testify about the effects that those drugs have, separately and in combination, including with respect to the likely impairment of a driver of a motor vehicle.

The Court further concludes, however, that Ms. Urfer may not in her testimony relate her permitted opinions (those not based on any quantitative analysis) to decedent specifically. Plaintiff cites certain standards from the American National Standards Institute / Academy Standards Board (ASB) governing expert toxicological opinions and

testimony, and defendants do not dispute that those standards are authoritative and relevant. The Court does not agree with plaintiff that paragraphs (f) and (g) of the cited § 5.3 provide any basis for the exclusion of opinions in this case, as Ms. Urfer has not performed extrapolations or calculated the dose of a drug taken by decedent.

Paragraph 5.3(c) is applicable here, however. It states: "A toxicologist should not opine as to a specific individual's degree of impairment based solely on a quantitative result." Ms. Urfer did opine in her report concerning decedent's degree of impairment, calling that impairment "substantial". As concluded above, Ms. Urfer may not offer any opinion based on a quantitative analysis. Defendants argue that her opinion concerning decedent's substantial impairment was not based "solely" on the quantitative test results. As an example, defendants cite the following statement from Ms. Urfer's report: "Mr. Workman's inability to avoid the collision with Mr. Kretzer's semi-trailer is consistent with the toxicology results and the impairment I would expect." In her deposition, Ms. Urfer explained that opinion by stating that the drugs would have affected decedent's reaction time and that she understood that the reaction time was an issue in causing the accident. Ms. Urfer has not identified any proper basis for opining that the accident was "consistent" with decedent's impairment, however. The cause of the accident, which may have involved many factors, does not fall within the demonstrated expertise of this witness, a toxicologist. She may properly opine that these drugs affect reaction time, but she may not opine that reaction time was a cause of the accident, and thus she may not opine that the fact of the accident was "consistent" with impairment in decedent. Such an opinion coming from an expert would be unfairly prejudicial because the opinion is not within the proper

scope of her expertise. Thus, this statement cannot provide an alternative basis for Ms. Urfer's opinion concerning the degree of decedent's impairment.

There is no other context that Ms. Urfer may cite here for this opinion. Defendants note Ms. Urfer's consideration of decedent's prescribed doses for his medications. While the fact that decedent was taking those medications may support an opinion that decedent was impaired, Ms. Urfer has not related her opinion of "substantial" impairment to that fact. Moreover, Ms. Urfer conceded in her deposition that a specific individual's tolerance level could affect the degree of impairment and that she had no information concerning decedent's particular tolerance. Thus, in accordance with this standard, the applicability of which defendants have not disputed, Ms. Urfer may not offer an opinion concerning the degree of decedent's impairment, including that he was "substantially" impaired.

For the same reasons, the standard set forth in paragraph 5.3(i) of the cited source is also applicable here. That standard provides:

> A toxicologist should not opine as to the effects of a drug or a combination of drugs on a specific individual without context of a given case. This does not prevent a toxicologist from addressing general effects of drugs at varying concentrations.

Again, Ms. Urfer has not identified any proper context that would allow her to relate her general opinions concerning the effects of these drugs on a driver specifically to decedent, whose tolerance level and medical history were unknown to her. Thus, although Ms. Urfer may opine that the presence of these drugs would likely affect a driver, even if present only in therapeutic amounts or only in the driver's prescribed doses, she may not opine specifically that *this* driver (decedent) was impaired.

9

The Court therefore grants plaintiff's motion to exclude testimony by Ms. Urfer to the extent of these rulings.

### B. *Testimony by Gray Beauchamp*

Plaintiff also seeks to exclude certain expert opinions by Gray Beauchamp, defendants' accident reconstruction expert. In his report, Mr. Beauchamp offered various opinions concerning how the subject accident occurred, including opinions concerning the conduct of the truck driver, defendant Kretzer.

Plaintiff takes issue with the final portion of Mr. Beauchamp's report, in which he analyzed decedent's ability to have avoided the crash. Specifically, Mr. Beauchamp considered three hypothetical situations that he stated were within decedent's control: (1) if decedent had reacted faster to the hazard in applying his brakes; (2) if decedent would have used the full braking capacity of the vehicle, instead of applying the brakes less fully (as the data indicates he did); and (3) if decedent had been traveling at the speed limit of 65 miles per hour, instead of setting the cruise control at 68 miles per hour (as the data indicates he did). With respect to decedent's reaction time, Mr. Beauchamp noted that, according to Ms. Urfer's expert report, decedent was impaired at the time of the crash and that one effect of the drugs found in decedent's blood is a slower reaction time. Mr. Beauchamp proceeded to create four tables to account for the four combinations of the speed and braking factors: (1) actual speed, actual braking; (2) actual speed, full braking; (3) speed limit, actual braking; (4) speed limit, full braking. Each table shows the braking time and speed at impact for that combination assuming a range of five different reaction times (actual reaction time, 0.5 seconds faster, 1.0 seconds faster, 1.5 seconds faster, and

2.0 seconds faster). Thus, as examples, Mr. Beauchamp calculated that for actual speed and actual braking, a 2.0-second improvement in reaction time would have reduced the speed at impact from 53 miles per hour to 10; for actual speed and full braking, a 0.5-second improvement in reaction would have avoided the accident; for the speed limit and actual braking, a 1.0-second improvement would have reduced the impact speed to 5 miles per hour, with the accident avoided with a 1.5-second improvement; and for the speed limit and full braking, the accident would have been avoided even with no improvement in the reaction time. Mr. Beauchamp thus concluded that the three factors likely combined to contribute to the crash.

Plaintiff first argues that because Ms. Urfer's opinions should be excluded, Mr. Beauchamp's opinions should also be excluded to the extent they rely on the opinions of Ms. Urfer. In his report, Mr. Beauchamp relied on Ms. Urfer's specific opinions that decedent was impaired and that the drugs in his system affect a person's reaction time. As discussed above, Ms. Urfer may still offer expert testimony that the drugs found in decedent's blood would likely cause impairment in a driver and that one effect would be a slower reaction time. Thus, the exclusion of certain other opinions by Ms. Urfer does not provide a basis for excluding any opinion by Mr. Beauchamp.

Plaintiff also argues that Mr. Beauchamp should not be permitted to offer opinions based on specific hypothetical improvements in the time in which decedent applied his brakes. Plaintiff notes that Mr. Beauchamp has neither relied on any evidence relating to the amount of any actual effect on decedent's reaction time nor offered any basis for

11

determining the reaction time of an average person in decedent's situation, and plaintiff argues that the use of these particular time intervals is therefore entirely speculative.

The Court agrees with plaintiff that such opinions by Mr. Beauchamp should be excluded. Defendants concede that Mr. Beauchamp had no knowledge of the actual amount that decedent's reaction time would have been slowed because of impairment from the drugs in his system, and they state that Mr. Beauchamp used a range of reaction times for that reason. Thus, it is undisputed that the times used by the expert lack any evidentiary basis, which makes those opinions fatally unreliable. It would be unfairly prejudicial to allow an expert witness to give the jury specific stopping distances and impact speeds that might have been achieved by decedent in the absence of any foundation for using particular reaction times from which those figures were calculated. The prejudicial effect is further heightened in this case by the absence of any evidence or discussion by Mr. Beauchamp of the reaction time of an average person in decedent's situation or of other factors that may have reasonably caused a delay between decedent's perception of the truck and his application of the brakes. The Court concludes that this lack of foundation for Mr. Beauchamp's particular opinions based on reaction time does not merely affect the weight of the expert evidence, but rather makes that evidence inadmissible under the applicable standards. Accordingly, in his expert testimony Mr. Beauchamp may not refer to or offer opinions based on specific hypothetical reaction times for decedent.[2]

---

[2] Thus, all of the columns other than the first one (representing the actual reaction time) would need to be removed from Mr. Beauchamp's tables, along with the reaction time row.

With respect to reaction time, that ruling leaves only Mr. Beauchamp's general opinion that an increased reaction time due to impairment contributed to the crash. That opinion, however, was not based on any particular scientific methodology. Rather, such an opinion is based directly on Ms. Urfer's opinions that the drugs in decedent's blood would likely cause impairment in a driver and that one effect is a slower reaction time. The possibility that a slower reaction time affected the speed at impact or even decedent's ability to avoid the crash altogether is not a matter that lies outside the normal ken of a lay juror. Thus, expert testimony on that issue would not be helpful to the jury, and the Court therefore excludes any such expert testimony by Mr. Beauchamp as irrelevant. Accordingly, Mr. Beauchamp may not offer any expert opinions concerning decedent's reaction time, and plaintiff's motion is granted to that extent.[3]

### III.   Defendants' Motions to Exclude

Plaintiff has designated Brooke Liggett as a retained damages expert. In her report, Ms. Liggett rendered opinions concerning the damages suffered by decedent's survivors (his spouse and three adult children) in the form of lost earnings and lost household services. By their present motions, defendants seek to exclude Ms. Liggett's expert testimony.

####   A.   *Qualifications*

---

[3] This ruling does not affect defendants' ability to argue to the jury at trial, based on Ms. Urfer's testimony, that decedent was at fault at least in part because his reaction time was diminished due to impairment from drugs and that the accident would have been less serious or would not have occurred if decedent had not been impaired.

Defendants first contend that Ms. Liggett is not qualified to give these opinions because she is an accountant, not an economist, and her valuations involve the application of economic principles. Defendants further argue that she is not qualified to do the valuation of household services.

The Court rejects this argument for exclusion based on the expert's qualifications. Ms. Liggett's report reveals that her practice does include economics as well as accounting, and she holds certifications and memberships in organizations relating to the field of economics. Defendants have not identified any particular issue or opinion that they believe extends beyond Ms. Liggett's expertise, other than to refer generally to the valuation of household services, and the Court concludes that Ms. Liggett is qualified to offer such opinions at trial.

### B.     *Reliability of Opinions*

Defendants also seek exclusion of Ms. Liggett's opinions relating to her valuation of lost household services under the reliability prong of the *Daubert* analysis. Defendants do not take issue with Ms. Liggett's basic methodology, by which she multiplied a number of hours by an hourly rate and then subtracted an amount for personal consumption. Instead, defendants' primary argument is that Ms. Liggett did not have a sufficient factual basis concerning decedent's actual contribution of household services.

The Court rejects this argument by defendants. In her report and in her deposition testimony, Ms. Liggett stated that she based her opinions in part on information from plaintiff, decedent's daughter, concerning decedent's actual household contributions, and defendants have not suggested any reason why Ms. Liggett's use of such information does

14

not represent a reliable method of valuation. The Court also rejects defendants' argument that plaintiff has not shown that she was a reliable source of such information (which argument defendants first made in their reply briefs). Ms. Liggett testified that she was told that plaintiff was the best source of information concerning decedent's actual contributions, and plaintiff demonstrated to Ms. Liggett that she did have such knowledge; thus, the Court concludes that Ms. Liggett's reliance on plaintiff's information was not unreasonable or otherwise impermissible. Defendants have not identified any specific reason why Ms. Liggett should have doubted the accuracy of that information from plaintiff.

In arguing that the factual basis for Ms. Liggett's opinions is deficient, defendants note that she did not read the depositions of plaintiff and decedent's spouse, but defendants have not cited any specific information in those depositions that Ms. Liggett should have considered. Defendants also note that Ms. Liggett could not state the specific number of hours that decedent or his son (who lived with decedent) spent on particular household tasks, but any such objection goes to the weight of Ms. Liggett's opinions, not their admissibility. Ms. Liggett relied on estimates concerning the time spent on household tasks generally, and thus Ms. Liggett did have a factual basis for her opinions.

The Court further concludes that defendants' other arguments do not provide a basis for exclusion of any particular opinion by Ms. Liggett. Defendants complain that Ms. Liggett based her opinion of the duration of future damages on decedent's lifespan without considering the lifespan of his spouse. Defendants rely on this Court's written opinion in *Cochrane v. Schneider National Carriers, Inc.*, 980 F. Supp. 374 (D. Kan. 1997)

15

(Lungstrum, J.), but that case is easily distinguished. In *Cochrane*, the decedent was a minor, and thus it was improper for the expert to have assigned damages over the course of the decedent's lifespan for the benefit of the survivors, who were the decedent's parents and who thus would have had much shorter lifespans. *See id.* at 378. The present case does not involve survivors that are a generation older than the decedent, but rather involves damages to the decedent's spouse and children; thus, the Court cannot conclude that it was impermissible for Ms. Liggett to use decedent's lifespan in rendering her opinions. Any argument that Ms. Liggett should have used a shorter lifespan for care given specifically to decedent's spouse – assuming defendants have evidence that her lifespan was shorter than decedent's – goes merely to the weight of Ms. Liggett's opinions in this case.

      Defendants also rely on this Court's conclusion in *Cochrane* that the expert had improperly assumed that the decedent would have given all of his excess income to his parents without considering the likelihood that the decedent would have had a family of his own. *See id.* at 378-79. Again, however, the ruling in *Cochrane* is not applicable in this case, as decedent's survivors are his spouse and children, who may reasonably be expected to have been the beneficiaries of decedent's earnings and contributions. Indeed, the Court made this very point in *Cochrane* when it specifically distinguished the circumstances in that case from a situation involving a deceased head of a household with surviving spouse and children, in which case one might reasonably assume that those survivors would be the beneficiaries of the decedent's support and services. *See id.* at 379. Inexplicably, defendants have failed to note that distinction drawn by the Court in

*Cochrane*, and they have made no attempt to explain why that case nevertheless supports exclusion of the expert opinions in this case.

Defendants next wonder whether there is any legal or factual basis for the inclusion of services by decedent for the benefit of an adult son in his household. The governing statute, however, provides that damages may be recovered for (and are not limited to) parental care, without any limitation on the age of the child of the decedent, and defendants have not cited any authority that would preclude a recovery for lost household services for the benefit of an adult child. Moreover, Ms. Liggett's opinions do not lack a proper factual basis, as she relied on information that decedent did perform household tasks that benefitted the adult son in his household (as well as tasks that benefitted his other adult children). Thus there is no basis for the exclusion of such opinions.

Defendants also object to Ms. Liggett's use of a particular table in valuing lost household services in this case. Ms. Liggett used a table for a man living with an employed spouse, but as defendants note, decedent's wife did not live with decedent (she lived in a nursing facility) and she was not employed. Ms. Liggett explained, however, that she chose that table as the one best approximating decedent's circumstances, which involved a household with two employed occupants (decedent and his son). Therefore, Ms. Liggett did articulate a basis for her use of the table, and defendants' objection goes to the weight of the opinions and not their admissibility.

In their remaining objections, defendants essentially argue that plaintiff's expert disclosure (including Ms. Liggett's report) was insufficient. The scheduling order in this case, however, required defendants first to assert any technical objections to the sufficiency

17

of an expert disclosure within 14 days after service of the disclosure, and then to confer with opposing counsel before filing a motion based on such an objection. Defendants did not comply with these requirements; therefore, any objections to the sufficiency of plaintiff's disclosure have been waived.

Moreover, even if these objections had not been waived, they would not provide a basis for excluding any expert opinion by Ms. Liggett. Defendants complain that the report did not explain with sufficient detail the manner in which Ms. Liggett employed discount rates to determine the present value of the survivors' losses. Ms. Liggett did note the classes of securities that she used, however, and she also listed all of her sources of information. Moreover, defendants were free to seek additional details in her deposition, but they chose not to do so. Defendants also complain that the report did not include the bases for the assumption concerning decedent's likely retirement date and the opinion that such a work duration does not exceed average worklife expectancy. Again, however, the report identified Ms. Liggett's sources of information, it stated specifically that she received the information about the likely retirement age in her discussion with plaintiff, and defendants chose not to explore the issue in Ms. Liggett's deposition. Finally, defendants' complaint that the report did not set out the specific information received by Ms. Liggett from plaintiff is borderline frivolous, as they have utterly failed to confront the facts that Ms. Liggett in her deposition described all of the information received from plaintiff *and* provided her notes containing statements made by plaintiff in that conversation. Thus, defendants cannot have suffered any possible prejudice from any such deficiency in the report (even assuming the report could be described as deficient), and the

alleged deficiencies do not provide a basis for the exclusion of any particular opinion by Ms. Liggett.

Accordingly, the Court denies defendants' motion to exclude in its entirety.

IT IS THEREFORE ORDERED BY THE COURT THAT plaintiff's motion to exclude certain expert testimony (Doc. # 58) is hereby **granted in part and denied in part**, as more fully set forth herein.

IT IS FURTHER ORDERED BY THE COURT THAT defendants' motions to exclude certain expert testimony (Doc. ## 59, 63) are hereby **denied**.

IT IS SO ORDERED.

Dated this 4th day of February, 2022, in Kansas City, Kansas.

*s/ John W. Lungstrum*
John W. Lungstrum
United States District Judge